**GULF OIL CORPORATION,**
Appellant,

v.

**TEXAS CITY REFINING, Inc.,**
Appellee.

No. 6862.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 11, 1954.

Decided Dec. 14, 1954.

William A. Grimes, Baltimore, Md. (Ober, Williams, Grimes & Stinson and David Ross, Baltimore, Md., on the brief), for appellant.

William L. Marbury and Michael P. Crocker, Baltimore, Md. (Piper & Marbury and John Marshall Jones, Jr., Baltimore, Md., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Gulf Oil Corporation (hereinafter called Gulf) brought a civil action in the United States District Court for the District of Maryland against defendant (formerly known as Petrol Refining, Inc., before it changed its name to Texas City Refining, Inc., and hereinafter referred to as Refining), in which Gulf sought to recover from Refining the fair market value of certain No. 6 fuel oil delivered by Gulf between August 1, 1949, and December 15, 1950, in connection with an agreement between plaintiff and defendant, dated July 26, 1949, known as exchange agreement LO No. 104. As of March 31, 1950, Gulf claimed there was owing it by Refining a total of 9,222 barrels of oil. As of December 15, 1950, Gulf claimed there was owing it, under this agreement, 63,431.6 barrels of No. 6 fuel oil, valued at $136,377.94. This is the amount for which Gulf sues. The District Court dismissed the complaint of Gulf and Gulf has appealed to us.

Gulf, a Pennsylvania Corporation, is one of the well known major oil companies operating in the Eastern part of the United States. Refining is a Delaware corporation organized in 1948, when its stock was issued in equal proportions to four shareholders. Three of these shareholders were Farm Cooperatives; the fourth shareholder was Petrol Terminal Corporation (hereinafter called Terminal), a Maryland corporation, which played an important part in the controversy giving rise to this civil action.

In July, 1949, one McSherry, on behalf of Refining, inquired of one Ricker in Gulf's Philadelphia office whether Gulf would be interested in entering into an exchange agreement with Refining. Ricker subsequently advised McSherry that Gulf would be interested. McSherry thereupon informed his superior, one Sweeton, who worked out the details with Gulf's home office in Pittsburgh. These negotiations resulted in exchange agreement LO No. 104, dated July 26, 1949, duly executed by Gulf and Refining. This exchange agreement forms the basis of the instant civil action.

The exchange agreement provided for the exchange of 20,000 barrels of No. 6 fuel oil per month. Deliveries from Gulf to Refining were to be made at Girard Point, Pennsylvania, and those from Refining to Gulf at Baltimore, Maryland, or, at Gulf's option, at Texas City, Texas. The agreement further contained provisions for payment of terminalling charges and other differentials, and various other provisions with respect to the exchange, including the right of either party to cancel upon sixty days' notice.

There were conflicts in the evidence as to just what happened after the signing of agreement LO No. 104 and after the agreement had been partly executed. We quote from the findings of the District Judge in this connection, and, since these findings have adequate support in the record, we must uphold them.

"By contract dated March 31, 1950, the defendant transferred its

entire oil marketing business, including its supply contracts, sales contracts, leases, inventories, accounts receivable, furniture and fixtures, miscellaneous agreements and marketing personnel, to Terminal. Terminal expressly assumed and agreed to perform and discharge all past and future obligations which defendant owed plaintiff under contract LO No. 104. Upon the execution of the contract of March 31, 1950, Eugene M. Callis, who was at that time president of defendant, instructed McSherry to conduct no further dealings on behalf of defendant and directed him to notify plaintiff among others that all further liftings under exchange agreements to which defendant was formerly a party were henceforth to be in the name of Terminal. Accordingly, sometime prior to the end of April 1950, McSherry notified Ricker that defendant ·was out of the oil marketing business and had no further need for any exchange contracts and that all transactions under contract LO No. 104 were thereafter to be in the name of Terminal. Ricker was at that time still employed in plaintiff's Philadelphia office and McSherry notified him because he was the representative of plaintiff with whom he had conducted all previous negotiations. ·Ricker inquired whether plaintiff would still be dealing with Callis and McSherry under the new arrangement and upon ·receiving McSherry's assurance that such was the case, Ricker suggested that McSherry send ·him a letter confirming this conversation. McSherry promised to do so but never did. Ricker assured McSherry that if Terminal needed any oil in the meantime it would be delivered.

"Subsequent to McSherry's call to Ricker in April no orders for the delivery of oil under contract LO No. 104 were given in the name of or on behalf of defendant. All orders given to plaintiff were given by McSherry in the name of Terminal and all products delivered by plaintiff were delivered to Terminal. No part of these products was ever received by defendant.

"All communications to plaintiff with respect to transactions subsequent to March 31, 1950, came from Terminal on its letter heads and none came from defendant. These communications included written requests for the delivery of product from time to time and several statements of exchange balances which plaintiff was asked to and did verify to Terminal. These statements included a 9,222 barrel overdraft in favor of plaintiff which existed on March 31, 1950. All invoices received from plaintiff relating to transactions subsequent to March 31, 1950, were paid by checks of Terminal.

"Although prior to August 30, 1950, it had failed to change the addresses on its invoices and had continued ·to send them·to defendant, subsequently, plaintiff addressed all invoices and requests for confirmation to Terminal alone. No invoices or requests for confirmation were sent to defendant thereafter. These invoices and requests for confirmation sent to Terminal always included the aggregate of all oil delivered by plaintiff under the contract and not yet returned to it including oil delivered by it prior to March 31, 1950.

"In November 1950 the defendant's ·vice president, William Fetter, communicated ·with N. Calvin Loomis, who was supervisor of distribution at plaintiff's home office in Pittsburgh, Pennsylvania, and who had authority to speak for plaintiff in all matters connected with the administration of contract LO No. 104, for the express purpose, as he stated to Loomis, of making sure that plain-

tiff understood that defendant was in no way responsible for any obligations under contract LO No. 104 but that the contract was in the name of Terminal and that the obligations under it were Terminal's, not defendant's. Loomis assured Fetter that the records of plaintiff would be altered so as to show that defendant was in no way responsible for performance of the contract."

\*　\*　\*　\*　\*　\*

"Thereafter from December 15, 1950 to May 1951, plaintiff delivered 156,760 more barrels to Terminal and received in exchange 24,448 barrels. At no time did plaintiff exercise its right under the contract to give notice of cancellation.

"Between August 29, 1950, and May 29, 1951, when a petition in bankruptcy was filed against Terminal, plaintiff addressed no communication of any kind to defendant other than the Loomis correspondence referred to above. No notice was ever given defendant of the status of the exchanges under the contract nor was any request or demand made by plaintiff upon defendant to perform any obligation thereunder. In every month subsequent to November 1950, Terminal defaulted in the payment of the terminaling charges due within 20 days under contract LO No. 104 and continually failed to make promised deliveries to plaintiff. No notice was ever given defendant of these defaults until after Terminal's bankruptcy. Plaintiff's credit manager stated in May 1951 that it was his understanding that Terminal rather than defendant was responsible for the oil due plaintiff under contract LO No. 104 and Terminal's assistant general credit manager testified that this opinion was based on discussions with persons in plaintiff's supply department."

\*　\*　\*　\*　\*　\*

"Subsequent to the month of April 1950, no product was ordered from plaintiff by defendant nor on its behalf by anyone with actual or apparent authority to act for it, and no product of plaintiff was delivered to or received by defendant.

"By the agreement of March 31, 1950, Terminal undertook to perform all defendant's obligations under exchange agreement LO No. 104 including the delivery of all oil to which plaintiff was then entitled. Thereafter, by its conduct, plaintiff intended to and did accept Terminal as substitute obligor for defendant under contract LO No. 104 and release defendant of all obligations thereunder."

On the basis of these findings, the District Judge arrived at these conclusions of law:

"1. A novation was effected whereby the plaintiff released and discharged the defendant from any and all liabilities under the exchange agreement provided by the contract of July 29, 1949, between the plaintiff and defendant, designated as exchange contract LO No. 104, and accepted Terminal as a substituted debtor and as solely responsible to the plaintiff for all obligations thereunder. The release, discharge and acceptance were implied by the facts and circumstances surrounding operations under exchange contract LO No. 104 and the conduct of the plaintiff after April 1950.

"2. Even if there had been no novation, the plaintiff is estopped to recover from the defendant because the defendant in reliance upon the plaintiff's notification that it was in no way obligated under LO No. 104 changed its position to its detriment. The plaintiff failed, during a period when Terminal's financial condition to the knowledge of the plaintiff was materially declining towards ultimate bankruptcy, to notify defendant of any obligations allegedly due the plaintiff and thereby deprived defendant of an opportunity to cause Terminal to fulfill

its obligation to defendant to perform LO No. 104 many months before its bankruptcy.

"3. Even if there had been no novation, none of the oil delivered after April 1950 under LO No. 104 was delivered to defendant or for the account of or on the credit of defendant, and defendant was not obligated in any way to return it or pay for it. All of said oil was sold and delivered by the plaintiff to Terminal solely in reliance upon Terminal's credit.

"4. Even if there had been no novation effected, all of the oil received by Gulf after April 1950 upon exchange LO No. 104 was by law applied in extinguishment of the earliest unreturned items in the oil exchange account and, therefore, in extinguishment of the 9,222 barrels unreturned on March 31, 1950, plus the 1955 barrels delivered and not returned during April 1950.

"5. As of the date of filing this suit, defendant was not indebted to plaintiff in any amount."

The District Judge thus decided the case in favor of Refining and against Gulf on three separate grounds. Any one of these grounds, if valid would sustain the judgment below. Since we think the District Judge was correct in all three instances—novation, estoppel and application of payments—the judgment below must be affirmed.

■ There is ample evidence in the record to sustain the District Court's conclusion that here a novation was clearly effected, under which Gulf consented, on adequate consideration, to the substitution of Terminal for Refining as the sole obligor under the exchange contract. Highly significant in this connection is the telephone conversation between McSherry and Ricker. The same is true of Ricker's inquiry whether Gulf would still be dealing with Callis and McSherry under the new arrangement and Ricker's subsequent statement that Terminal would get any oil it needed.

Again, the testimony of Fetter as to his conversation with Loomis and the subsequent correspondence which passed between Loomis and counsel for Refining would seem to indicate that Gulf actually consented to a novation. Fetter's conversation with Loomis, on November 24, 1950, was held nearly eight months after Terminal had taken over the exchange agreement with Gulf. In the meantime, Gulf had received notice from McSherry that Refining was out and that all dealings under the exchange agreement were thereafter to be for the account of Terminal. Following this notice from McSherry, all correspondence relating to the exchange agreement had originated with Terminal. Refining had dropped out of the picture altogether. In recognition of this fact, Gulf had since August 29th been addressing all of its communications relating to this contract to Terminal and not to Refining.

■ True it is that there was here no formal contract of novation. The law is clear, however, that a novation may be proved by circumstantial evidence and by the conduct of the parties to the original contract. As Judge Chesnut aptly said in MacKenzie Laboratories v. Lawrence, D.C., 80 F.Supp. 710, 713:

"The occurrence of a novation is not to be presumed but must be satisfactorily shown by the party who asserts it. Where, as in the instant case, the novation consists in the substitution of one debtor for another, it is, of course, necessary to show the consent both of the creditor and of the substituted debtor as well as that of the original debtor. The effect of the novation is to discharge the original debtor and substitute the obligation of the new debtor. And this must have been in accordance with the intention of the parties. It is, however, not necessary to show an express consent of the parties as it may be implied and inferred from circumstantial evidence." (Italics ours.)

And we might pertinently paraphrase another excerpt from this same opinion, 80 F.Supp. at page 715:

"That the plaintiff in this suit [Gulf] has elected to proceed against [Refining] is, I think, explained by the changes that have occurred in the financial fortunes of [Terminal]. * * * after its financial fortune had failed * * * the plaintiff [Gulf] has elected to seek to revive its claim against [Refining] as its debtor. But even so late as [May, 1951], and after the plaintiff was aware of the change, we still find [Gulf] consolidating the claims for [all of the oil] as one whole claim against [Terminal]."

See, also, Parish Manufacturing Corporation v. Martin-Parry Corporation, 285 Pa. 131, 131 A. 710; Manfre v. Sharp, 210 Cal. 479, 292 P. 465; Kenison v. Anderson, 83 Mont. 430, 435, 272 P. 679; Associates Discount Corporation v. Greisinger, D.C., 103 F.Supp. 705.

The consideration was the legal benefit to Gulf resulting from the extinguishment of its obligation to Refining and the accrual of new obligations from Terminal, and the legal detriment to Terminal arising from Terminal's assumption of these new obligations. The requirements of the doctrine of consideration are thus satisfied.

See, Citizens Bank of Wind Gap v. Lipschitz, 296 Pa. 291, 145 A. 831; Linz v. Schuck, 106 Md. 220, 67 A. 286, 11 L.R.A.,N.S., 789; Bankers' Mortgage Co. of Topeka v. Breyfogle, 136 Kan. 362, 15 P.2d 440; Restatement of Contracts, § 84(d); Williston on Contracts, (Rev. Ed.) Vol. 1, § 131, p. 457.

Almost the same evidence from which we have inferred a novation here is valid to sustain Refining's plea of estoppel. Even if it be assumed that Gulf never made an express promise to release Refining, the record clearly shows that the conduct of Gulf plainly expressed the intention to release Refining from all liability. The telephone conversation between McSherry and Ricker, Gulf's subsequent exclusive dealings with Terminal and Loomis's statement that he would "straighten out his files so that Petrol Refining would no longer be obligated", all were consistent only with an intention not to assert any claim against Refining and necessarily amounted to an implied, if not express, promise to accept Terminal as the sole debtor. Many years ago, it was stated by Mr. Justice Swayne in Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618:

"The estoppel here relied on is known as an equitable estoppel, or estoppel in pais. The law upon the subject is well settled. *The vital principle is, that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted.*" (Italics ours.)

See, also, Fried v. Fisher, 328 Pa. 497, 196 A. 39, 115 A.L.R. 147; United States, for Use and Benefit of Noland Co. v. Wood, 4 Cir., 99 F.2d 80.

We can find here, too, ample evidence of reliance upon Gulf's conduct by Refining to its detriment. During the whole period of this reliance even as late as the conversation with Loomis, if Refining had been informed that Gulf intended to hold it liable, it seems that any security that Refining would have then obtained from Terminal for the performance of the exchange agreement could not have been set aside as a preference in the ensuing bankruptcy of Terminal which took place a half a year later. Gulf lulled Refining into a false sense of security and never asserted any claim against Refining until Terminal's subsequent bankruptcy prevented Refining from having any recourse against Terminal which was, at least as between Refining and Terminal, the principal debtor.

A further and final ground for the relief of Refining is, as found by Judge Coleman, the doctrine of the application of payments. We sustain his conclusion:

"All of the oil received by Gulf after April 1950 upon exchange LO No. 104 was by law applied in extinguishment of the earliest un-returned items in the oil exchange account, and therefore, in extinguishment of the 9,222 barrels unreturned on March 31, 1950, plus the 1,955 barrels delivered and not returned during April 1950."

There were no separate accounts for oil exchanged with Terminal as opposed to oil exchanged with Refining under LO No. 104. Nor is there any evidence that Gulf in any manner set apart or assigned the oil delivered to Gulf from time to time under the exchange in payment of any particular item of the account or for the purpose of extinguishing quantities due it from Terminal as opposed to quantities due from Refining or vice versa. No appropriation to any particular oil debt was made of the various quantities delivered first by Refining and later by Terminal under LO No. 104. Instead, the successive returns or "liftings" of oil flowing to Gulf, whether from Refining or from Terminal, were throughout the life of this contract merely added monthly to the single running account so that the monthly rests in the account or the "residual" or the "accum(ulating) total" as Gulf termed them, could be ascertained. Neither Gulf, Terminal nor Refining directed the application of these oil payments to any item of the account.

Where payments are made upon a running account, and neither the debtor nor the creditor specifies the items to which these payments are to apply, the law applies these payments in discharge of the oldest items of the account. United States v. Kirkpatrick, 9 Wheat. 720, 22 U.S. 720, 6 L.Ed. 199; In re Estate of Lorch, 284 Pa. 500, 131 A. 381, 42 A.L.R. 922; Risher v. Risher, 194 Pa. 164, 45 A. 71, 72; Pardee v. Markle, 111 Pa. 548, 5 A. 36, 40; Souder v. Schechterley, 91 Pa. 83, 86; Delaware Dredging Co. v. Tucker Stevedoring Co., 3 Cir., 25 F.2d 44, 46; Gass v. Stinson, 10 Fed.Cas. pages 72, 77, No. 5,262.

The oil exchange payments, being undesignated by anyone at the time they were made, successively cancelled out the oldest items first, with the result that the 11,177 barrel balance due Gulf on the exchange on April 30, 1950, (the date when McSherry of Terminal, as the lower court found, notified Gulf through its agent Ricker that all subsequent dealings were with Terminal and not Refining) was extinguished by the 39,196 barrels delivered to Gulf after April 30, 1950. Moreover, even if one were to believe (as the District Judge here did not) that Gulf did not learn until August 29, 1950 (the date when, by its own admission it started sending its invoices solely to Terminal) that its sales were to Terminal and not Refining, the balance on the running account would likewise be extinguished.

For the reasons stated, the judgment of the District Court is affirmed.

Affirmed.